**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 09-cv-00818-CMA-KMT

JAMIE PAVICICH,

      Plaintiff,

v.

AETNA LIFE INSURANCE COMPANY

      Defendant.

---

**ORDER OVERTURNING DENIAL OF ERISA BENEFITS, ALLOWING ATTORNEYS'
FEES, COSTS, AND PRE-JUDGMENT INTEREST, AND REMANDING FOR
DETERMINATION OF EDUCATION BENEFITS**

---

      This matter is before the Court on Defendant Aetna Life Insurance Company's

("Aetna's") Motion for Judgment Based Upon the Administrative Record (Doc. # 22) and

Plaintiff Jamie Pavicich's Motion for Summary Judgment (Doc. # 23). For the reasons

discussed below, Defendant's Motion for Judgment is DENIED and Plaintiff's Motion for

Summary Judgment is GRANTED.

## I.  PROCEDURAL BACKGROUND

      On April 9, 2009, after having exhausted her administrative remedies and being

advised that she could proceed with a civil lawsuit, Plaintiff Jamie Pavicich filed a

Complaint (Doc. # 1) against Defendant Aetna and The Western Union Company.[1]

---

[1]   The Western Union Company was subsequently dismissed from the instant action,
pursuant to a Stipulated Notice of Dismissal of Defendant, The Western Union Company.
(Doc. # 8.)

On November 2, 2009, Defendant filed a Motion for Judgment Based on the Administrative Record.  (Doc. # 22.)  Plaintiff responded on December 3, 2009.  (Doc. # 27) and Defendant replied on January 11, 2010 (Doc. # 28).

Plaintiff filed her Motion for Summary Judgment on November 2, 2009.  (Doc. # 23.)  Defendant responded on December 3, 2009 (Doc. # 26) and Plaintiff replied on January 11, 2010 (Doc. # 29).

## II.  FACTUAL BACKGROUND[2]

This dispute arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1416, and concerns Defendant's denial of accidental death insurance benefits to Plaintiff Jamie Pavicich, the widow of the deceased insured, Anthony C. Pavicich.

Mr. Pavicich was a participant in an employer-sponsored Life Insurance and Accidental Death and Personal Loss Plan (the "Plan").[3]  Plaintiff was listed as a beneficiary under the Plan and Defendant is the claims administrator and payor of benefits under the Plan.

On August 17, 2007, Mr. Pavicich fell, hit his head, and suffered a cervical spine injury.  He was delivered to the emergency room at Littleton Adventist Hospital.  The Emergency Department Report states, in pertinent part:

_____

[2]  Unless otherwise noted, the following facts are undisputed and taken from the Administrative Record.

[3]  A copy of the Plan is at AR 00576-00681.

This is a 35-year old male [who] was apparently seen for suicidal ideation at Porter Hospital last week, was then at a psychiatric treatment facility, was discharged from there yesterday, was over at his ex-wife's house according to the paramedics, apparently getting ready to leave the ex-wife's house when he had a seizure and fell onto his face. After that, he was never able to get up and was complaining of neck pain with difficulty moving his arms and legs, and with some dysthesias in his arms as well.

[Plaintiff] reported to the paramedics that he has a history of seizures, but is not on any seizure medication and apparently only has seizures when his antidepressant medications are altered. He is currently on lithium, Abilify, and one other psychiatric medication.

*       *       *

It is unclear to me the exact mechanism of his injury. It certainly could have happened with a fall. I suppose it could have happened with a fall associated with a seizure. The patient's seizure history is a little confusing to me. He is not on any seizure medications and he has a normal bicarb on his field bloods, so it is not completely clear to me that this represented a seizure.

*       *       *

(AR 00435-00437).

That same day, Plaintiff underwent C-spine fusion. (AR 00441). The Pre Op History and Physical Report (AR 00441-00443) described Plaintiff's medical history, as follows:

This man has a history of bipolar disorder for the last 2-1/2 years. He has been hospitalized 8-10 times over that period of time and has three prior suicide attempts. He has had frequent medication changes. He was last admitted to the Porter ER one week ago for an exacerbation and transferred to the Highland Behavioral Health facility. There, he was started on Abilify and Enfem which were added to his Lithium regimen . . . .

(AR 00441).

The Pre Op History and Physical Report described the accident as follows:

Today, [Mr. Pavicich] went to his ex-wife's[4] house and as he walked into the house, had a witnessed seizure.  His body stiffened, fell forward and then he hit his head.  His wife witnessed generalized tonic/clonic movements without bowel or bladder incontinence or tongue biting.

\*       \*       \*

IMPRESSION:

1.  C-spine injury resulting in quadriplegia status post C-spine fusion.
2.  Spinal shock with hypotension - receiving fluids and phenylephrine
3.  Seizures secondary to antidepressant medication.
4.  Crohn's on Imuran and Asacol.

(AR 00441, 00443).

An Operative/Procedure Report stated as follows, in pertinent part:

OPERATIVE INDICATIONS: Mr. Pavicich came to the emergency room after he fell.  He had a seizure at home and is evidentially on bipolar medications for which makes seizures more likely.

(AR 00447).

Mr. Pavicich died on August 24, 2007.  A draft Discharge Summary Report prepared by Littleton Adventist Hospital described the accident as follows:

The patient was at his ex-wife's house when he had a witnessed seizure, likely medication related.  His body stiffened, he fell forward, and then hit his head.  His wife witnessed a generalized tonic clonic movement without bowel or bladder incontinence or tongue biting.

[The patient] was seen . . . and underwent a C-spine fusion.  The patient remained quadriplegic with spinal shock.  He subsequently developed fevers up to 103 degrees with progressive hypotension overnight requiring

_____

[4]  Although Plaintiff is referred to as Mr. Pavicich's ex-wife several times in the record, Plaintiff's divorce from Mr. Pavicich was never finalized.  (*See* AR 00372).

Levophed 20 mcg per minute. He developed progressive metabolic acidosis, progressive renal failure, and thrombocytopenia/DIC. He ultimately sustained a ventricular tachycardic arrest, was shocked with asystole. There was no response to epinephrine 1, 2 and 5 mg, nor did he respond to bicarbonate, calcium chloride or fluids. An arrest was called after 17 minutes and family was notified.

CAUSE OF DEATH:
1. Shock, query septic, query secondary to autonomic dysfunction.
2. Status post C-spine fusion for cervical code dislocation.
3. Acute respiratory failure secondary to aspiration pneumonia.
4. Status post seizure secondary to antidepressant medications.
5. Crohn's disease, immunosuppressed on Imuran.
6. Septic shock.

*  *  *

(AR 00433, 00434).

On September 4, 2007, Plaintiff called to inform Defendant of Mr. Pavicich's

death. (AR 00039-40). In pertinent part, Plaintiff advised Defendant:

[Mr. Pavicich] was on a new medication Emsam and had seizure, fell broke his neck and was in intensive care unit for a week before expiring; caller states he was on a similar medication in the past which caused seizure activity as well[.]

(AR 00040).

On September 5, 2007, a State of Colorado Certificate of Death was issued. (AR

00375). The stated cause of death was "Complications of cervical spine injury

sustained during seizure activity." Soon thereafter, Mr. Pavicich's employer submitted

a Proof of Death to Defendant. (AR 00371-74).

On September 11, 2007,[5] Plaintiff submitted to Defendant a claim and proof of Mr. Pavicich's death, seeking payment under both the life insurance portion of the Plan and the accidental death and personal loss coverage of the Plan. (AR 00372).

On October 2, 2007, Defendant issued a letter to Plaintiff requesting "additional records" to complete review of Plaintiff's claim for Accidental Death and Personal Loss ("Accidental Death") Insurance benefits. (AR 00384). Specifically, Defendant requested "Medical Records from the date of accident to death" and the "Medical Examiner report from the date of accident."

Plaintiff responded on October 11, 2007, and submitted an Arapahoe County Office of the Coroner External Examination Report. (AR 00385-90). The Report contained the following pathologic diagnoses:

    I.      Complications of cervical spine injury following blunt force trauma sustained during seizure activity

          a.      Clinical diagnosis of quadriplegia status post C6-7 fracture-dislocation with spinal cord compression

          b.      History of aspiration pneumonia and septic shock

    II.     History of depression and bipolar disorder

    III.    History of Crohn's disease

---

[5]  The fax cover sheet accompanying the claim bears a date of September 11, <u>2002</u>. Given the aforementioned chain of events, the Court construes this to be a typographical error.

(AR 00385). The Coroner further opined that Mr. Pavicich "died of complications of cervical spine injury following blunt force trauma sustained during seizure activity; other significant conditions included depression and bipolar disorder." (AR 00386).

On November 27, 2007, Defendant approved and issued payment to Plaintiff in the amount of $150,000 for Life Insurance benefits (the "November 27 Decision"). (AR 00480-83). However, Defendant denied Plaintiff's claim for Accidental Death benefits because "the information received in support of [the Accidental Death benefit] claim has not established that this loss falls within the [Plan's] coverage requirements[.]" (*Id*. at 480). Defendant further reiterated that the at-issue Plan does not "provide coverage for all deaths resulting from bodily injuries caused by an accident," and noted the Plan's various exclusions. (*Id*. at 481). Defendant also identified the following documents on which it based its decision to deny coverage: (1) State of Colorado Certificate of Death dated August 27, 2007; (2) Proof of Death claim dated September 6, 2007; (3) Arapahoe County Office of the Coroner External Examiner Report; (4) El Paso County Coroner Toxicology Report; and (5) Littleton Adventist Hospital Medical Records. (*Id*.)

In addition to the aforementioned documents, the following factors were also influential on Defendant's decision: (1) that Mr. Pavicich's noted immediate cause of death was complications of cervical spine injury sustained during seizure activity; (2) Mr. Pavicich's history of depression and bipolar disorder and three prior suicide attempts; (3) the at-issue seizure occurred one day after Abilify and Emfem were added to his

Lithium regimen for treatment/management of his bipolar disorder; and (4) Mr. Pavicich had a demonstrated history of having seizures when his antidepressant medications were altered. (*Id.*) Based on the foregoing, Defendant concluded that Mr. Pavicich's death "was caused or contributed to by a bodily infirmity, disease, and medical treatment" and, therefore, excluded by the Plan. (*Id.* at 482). Accordingly, Defendant denied Plaintiff's claim for Basic and Supplemental Accidental Death benefits in the amount of $75,000 and $225,000, respectively. (*Id.*)

Defendant invited Plaintiff to submit additional information, within 60 days of the November 27 Decision. Specifically, Defendant requested: (1) written medical documentation that would establish that Mr. Pavicich's death was the direct result of an injury resulting from an accident; and (2) written medical documentation that would establish that Mr. Pavicich's death was not caused or contributed to by a bodily infirmity, disease, and/or medical treatment. (AR 00482).

On October 24, 2008, nearly eleven months after Defendant's November 27 Decision, Plaintiff issued a letter challenging the Decision to the extent it was premised on a purported history of seizures and/or that Mr. Pavicich's August 17, 2007 seizure was medication-induced ("Plaintiff's Appeal Letter"). (AR 00276-78). Plaintiff's Appeal Letter enclosed a May 28, 2008 letter from a Karen V. Fukutaki, M.D., who, after reviewing various medical records, opined,

> I am unable to find that Mr. Pavicich's psychiatric medications can be directly linked to his having had a seizure immediately preceding his death. These medications (and many other things) can cause decreased blood pressure. It is possible he lost consciousness and hit his head

rather than had a seizure and hit his head leading to his death.  The
reports document his having lost consciousness or become dizzy while
on the treadmill in the weeks before his death.  It does not appear this was
medically evaluated at the time.

(AR 00280).  Dr. Fukutaki neither treated nor examined Mr. Pavicich.

On January 21, 2009, 83 days after receipt of Plaintiff's Appeal Letter, Defendant

responded.  (AR 00292-93).  In its response, Defendant upheld its prior denial of

Accidental Death benefits and explained the findings of its Medical Director, Donald

Liss.  Upon review of Mr. Pavicich's file, Liss concluded that "the death was caused

by complications resulting from a cervical spinal cord injury which resulted from a fall,

that the fall was a direct result of a generalized tonic-clonic seizure likely related to

medications to treat depression and bipolar disorder and, consequently, the loss was

caused or contributed to by a bodily or mental infirmity and medical treatment."

(AR 00290).[6]

## A.    THE INSURANCE PLAN

The Accidental Death and Personal Loss Coverage portion of the Plan states, in

pertinent part, as follows:

This Plan pays a benefit if, while insured, a person suffers a bodily injury
caused by an accident; and if, within 365 days after the accident and as a
direct result of the injury, he or she loses:

- His or her life.

*    *    *

(AR 00656).

---

[6]    Defendant also advised Plaintiff that, because she had exhausted her administrative
remedies, she may proceed with a civil lawsuit, if she continued to disagree with Defendant's
denial of benefits.  (*Id.*)

The Plan also contains an Education Benefit for the insured's dependent children and surviving spouse, where the insured's loss of life solely and directly resulted from an accident. (*See* AR 00659, 661).

Additionally, the Plan contains the following limitations:

This coverage is only for losses caused by accidents. No benefits are payable for a loss caused or contributed to by:

- A bodily or mental infirmity.
- A disease, ptomaine, or bacterial infection.*
- Medical or surgical treatment.*

                    *        *        *

- Use of alcohol, intoxicants, or drugs, except as prescribed by a physician . . . .

(AR 00663).

The Plan further states,

*These do not apply if the loss is caused by:

- An infection which results directly from the injury.
- Surgery needed because of the injury.

The injury must not be one which is excluded by the terms of this section.

(AR 00665).

## III. STANDARD OF REVIEW

At the outset, the Court addresses the fact that, unlike Defendant, Plaintiff filed a Motion for Summary Judgment, as opposed to a motion for judgment on the administrative record. As set forth in *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579 n.31 (10th Cir. 1994), summary judgment is improper in actions seeking

judicial review of the administrative record.  Pursuant to *Olenhouse*, other district courts

in the Tenth Circuit have determined that the summary judgment standard is not the

proper means to resolve ERISA disputes.  *See Stevens v. Metro. Life Ins.*, No. 05-cv-

00563, 2006 U.S. Dist. LEXIS 76504, at *11 (D. Colo. Oct. 20, 2006) (collecting cases).

"Instead, the court acts as an appellate court and evaluates the reasonableness of

a plan administrator or fiduciary's decision based on the evidence contained in the

administrative record."  *Panther v. Synthes*, 380 F. Supp. 2d 1198, 1207 n.9 (D. Kan.

2005).  Accordingly, this Court will not apply the traditional summary judgment standard

of review to this dispute.[7]

As determined by the Supreme Court in *Firestone Tire & Rubber Co. v. Bruch*,

489 U.S. 101, 115 (1989), "a denial of benefits challenged under § 1132(a)(1)(B) is to

be reviewed under a *de novo* standard unless the benefit plan gives the administrator or

fiduciary discretionary authority to determine eligibility for benefits or to construe the

terms of the plan," in which case the court determines whether the denial of benefits

was arbitrary and capricious.  *See also Trujillo v. Cyprus Amax Minerals Co. Ret. Plan

Comm.*, 203 F.3d 733, 736 (10th Cir. 2000) (stating that a reviewing court applies an

"arbitrary and capricious" standard to a plan administrator's actions).  Under the

arbitrary and capricious standard, the administrator's decision need not be the only

logical one or the best one; the decision will be upheld provided that it is "grounded on

---

[7]   Even if the traditional summary judgment standard of review applied, the Court finds that, while the parties dispute certain factual issues, namely the causes of Mr. Pavicich's fall, those issues are not material, as will be discussed in greater detail below.

any reasonable basis." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999).

"The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness – even if on the low end." *Nance v. Sun Life Assurance Co. of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002).

In the instant case, the Plan explicitly grants Defendant, as the Plan administrator, the discretionary authority to determine eligibility for benefits and to construe the Plan's terms. (AR 00614). Accordingly, this Court will review Defendant's denial of Accidental Death benefits to determine whether the denial was arbitrary and capricious, or whether the decision was reasonable and based on substantial evidence in the record. *See Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1189-90 (10th Cir. 2007); *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (stating that a decision is not arbitrary and capricious if it is based on substantial evidence in the record).

"To determine whether a plan administrator considered and asserted a particular rationale, we look only to those rationales that were specifically articulated in the administrative record as the basis for denying a claim." *Flinders*, 491 F.3d at 1191 (citing 29 U.S.C. § 1133(1) (stating that a plan administrator must "set[ ] forth the specific reasons for such denial, written in a manner calculated to be understood by the participant")).

Despite the foregoing, Plaintiff contends that the Court should apply a *de novo* standard of review because Defendant purportedly violated the Plan's

12

mandatory terms, as well as 29 C.F.R. § 2560.503-1(i)(1),[8] when it failed to notify

Plaintiff of its final decision within sixty days from its receipt of Plaintiff's appeal letter.

(Doc. #27 at 6-7).  Alternatively, Plaintiff contends that the abuse of discretion standard

should be altered and the Court should give less deference to Defendant's decision

because Defendant had a conflict of interest, since it is both the insurer and the claims

administrator under the Plan.  (*Id.* at 8, 11).  The Court disagrees for reasons discussed

in greater detail below.

## IV.  ANALYSIS

As set forth above, the parties dispute the actual cause of Mr. Pavicich's death

and whether that cause is excluded under the Plan.  "A basic rule of insurance law

provides that the insured has the burden of showing that a covered loss has occurred,

while the insurer has the burden of showing that a loss falls within an exclusionary

clause of the policy."  *Pitman v. Blue Cross and Blue Shield of Okla.*, 217 F.3d 1291,

1298 (10th Cir. 2000); *see also Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1155

(10th Cir. 2009) (stating that the claimant bears the burden of proving the occurrence of

a covered loss).

---

[8]  Section 2560.503-1(i)(1) states, in pertinent part, that "the plan administrator shall notify a claimant . . . not later than 60 days after receipt of the claimant's request for review by the plan, unless the plan administrator determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim.  If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 60-day period."

## A. THE ADMINISTRATIVE APPEAL DECISION'S PURPORTED UNTIMELINESS

This Court has previously considered, and rejected, the notion that a plan administrator's untimely response to an administrative appeal warrants *de novo* review. *See Kohut v. Hartford Life and Accident Ins. Co.*, No. 08-cv-00669, 2008 WL 5246163, at *4-*7 (D. Colo. Dec. 16, 2008). In pertinent part, this Court opined that, pursuant to *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008), "special procedural or evidentiary rules" were neither necessary nor desirable in ERISA cases and the untimely denial of benefits should be merely one of several factors that the reviewing court considers in determining whether benefits were improperly denied. *Id.* at *5. Further, the importance of such untimeliness should depend upon the nature of the delay, such as the cause, length, and any resultant prejudice to the claimant. *Id.*

In the instant case, Defendant responded to Plaintiff's Appeal Letter 83 days after it was received, in which response it upheld the initial denial of Plaintiff's claim. However, despite this delay, which exceeded the Plan's and the Regulation's 60-day time limitations by a mere 23 days, the Court finds that the arbitrary and capricious standard of review applies. Plaintiff has failed to present any meaningful evidence that the 23-day delay caused her prejudice or that Defendant acted in bad faith;[9] in sum, the

---

[9]  Plaintiff asserts that "Aetna's actions and the manner in which it handled this appeal are evidence of Aetna's bad faith . . . . Aetna fail[ed] to keep the Plaintiff informed as to the status of the appeal, and repeatedly failed to return phone calls or provide Plaintiff's counsel with any information[.]" (Doc. # 29 at 17). However, Plaintiff has not pointed to any evidence in the record that supports this assertion. Plaintiff also asserts that Aetna acted in bad faith by: (1) having its own Medical Director, rather than an independent medical professional, review Mr. Pavicich's medical records and (2) taking 26 days to issue a denial letter after receiving its Medical Director's opinion. (*Id.* at 18). However, Plaintiff fails to support these assertions of bad faith with any legal authority.

Court finds that the delay was inconsequential.  *See Kohut*, 2008 WL 5246163, at *6

(finding seventy-four day delay was inconsequential for similar reasons).  Further,

Defendant's relatively short delay was preceded by Plaintiff's own nearly-eleven month

delay to appeal Defendant's initial denial.  Consequently, Plaintiff's own delay renders

disingenuous her present assertion that, "as a single parent who was left as the sole

financial provider for her two minor children . . . it is clear that every single day of delay

is prejudicial to the Plaintiff."  (Doc. # 29 at 16.)

　　　　In a further attempt to obtain *de novo* review, Plaintiff cites to *Kellogg v.

Metro. Life Ins. Co.*, 549 F.3d 818 (10th Cir. 2008).  However, that case is entirely

distinguishable from the instant dispute, because, unlike in the instant case, the

defendant insurer failed to respond to the plaintiff's administrative appeal.  Based on the

foregoing, the Court finds no reason to apply a *de novo* review standard to this case.

**B.　　THE PURPORTED CONFLICT OF INTEREST**

　　　　An inherent conflict of interest exists where, as in the instant case, the insurer

and plan administrator are the same.  *Hidalgo v. Comcast Comprehensive Health and

Welfare Plan*, No. 06-cv-01009, 2007 WL 2889707, at *4 (D. Colo. Sept. 28, 2007)

(citing *Fought v. UNUM Life Ins. Co.*, 379 F.3d 997, 1006 (10th Cir. 2004)); *see also

Cirulis v. UNUM Corp. Severance Plan*, 321 F.3d 1010, 1017 n.6 (10th Cir. 2003);

*Pitman v. Blue Cross and Blue Shield of Okla.*, 217 F.3d 1291, 1296 (10th Cir. 2000)

(stating, "when an insurance company serves as ERISA fiduciary to a plan composed

solely of a policy or contract issued by that company, it is exercising discretion over

a situation for which it incurs direct, immediate expense as a result of benefit determinations favorable to plan participants.") (quoting *Brown v. Blue Cross and Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1561 (11thCir. 1990)).  The conflict arises from the plan administrator's dual role as (1) a fiduciary, in which it may favor granting a borderline claim, and (2) an administrator whose financial interest would counsel against granting borderline claims.[10]  *See Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2348 (2008).

Plaintiff asserts that, because a conflict of interest exists, this Court should apply a burden-shifting approach, in addressing the reasonableness of this benefits denial.  *See* Doc. #24 at 13 (citing to *Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997 (10th Cir. 2004)).  However, the Tenth Circuit has abandoned such an approach, pursuant to the Supreme Court's rejection in *Glenn* of special burden-of-proof rules.  *Id.* at 2351.  The Supreme Court further noted that, although a conflict of interest must be weighed as <u>a</u> factor in determining whether there is an abuse of discretion, such conflict should <u>not</u> necessitate a *de novo* review.  *Id.* at 2346, 2350.

In applying the "combination of factors" approach, a reviewing court should give greater weight to a conflict of interest "where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an

---

[10]  Such a conflict appears to be the norm in most ERISA plans.  *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 2350 (2008) (acknowledging that many ERISA plan administrators perform dual claims evaluation and benefit payment roles); *see also id.* at 2353 (Roberts, C.J., concurring) ("[T]he lion's share of ERISA plan claims denials are made by administrators that both evaluate and pay claims.") (internal quotation and citations omitted).

insurance company administrator has a history of biased claims administration." *Id.* at 2351. A reviewing court should give less weight to the conflict "where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id.* However, where the conflict actually motivated or influenced the administrator's decisionmaking, an abuse of discretion may have occurred. *Id.* at 2354 (Roberts, C.J., concurring).

Indeed, the "imprecise" nature of the Supreme Court's instructions has created uncertainty for reviewing courts, including those within the Tenth Circuit. While many of the post-*Glenn* Tenth Circuit decisions cite to the new standard of analyzing a conflict's impact on a benefits determination, few decisions are explicit in their application of the standard. Nevertheless, Tenth Circuit post-*Glenn* decisions have applied the "combination of factors" approach. *See*, *e.g.*, *Loughray v. Hartford Group Life Ins.* Co., 366 Fed. Appx. 913 (10th Cir. 2010) (unpublished); *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141 (10th Cir. 2009); *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187 (10th Cir. 2009); *Brown v. Hartford Life Ins. Co.*, 301 Fed. Appx. 772 (10th Cir. 2008) (unpublished); *Weber v. GE Group Life Assurance Co.*, 541 F.3d 1002 (10th Cir. 2008);

In *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1156-57 (10th Cir. 2009), the Tenth Circuit affirmed the lower court's determination that the denial of accidental death benefits was reasonable, despite the inherent conflict of interest. In reaching this conclusion, the appellate court found that the plan administrator's reliance on government documents, such as the death certificate and autopsy report, reduced the potential bias that could arise from the inherent conflict. *Id.* Moreover, the court

17

found that, based on the findings contained therein, the defendant reasonably concluded that the plaintiff failed to prove her mother's death was accidental. *Id*.

Similarly, in the instant case, although an inherent conflict exists because Defendant is both the insurer and claim fiduciary, the Court finds that any potential bias is reduced by Defendant's reliance on government reports such as the State of Colorado Certificate of Death, the Arapahoe County Office of the Coroner External Examiner Report, and the El Paso County Coroner Toxicology Report. (AR 00481). Defendant also relied on medical records from Littleton Adventist Hospital, where Mr. Pavicich received emergency room medical care, including surgery, and where Mr. Pavicich remained until his death. (AR 00433-00466). However, unlike in *Hancock*, the findings in these documents fail to support Defendant's conclusions that Mr. Pavicich's death was not accidental, as will be discussed in greater detail below. In any event, Plaintiff has not presented any evidence that Defendant's decision was motivated or influenced by a conflict.

## C.    CONTRACT INTERPRETATION AND CAUSATION

The terms of an insurance policy must be construed according to their plain and ordinary meaning, as a reasonable person in the position of the plan participant would have understood them. *Miller v. Monumental Life Ins.* Co., 502 F.3d 1245, 1249 (10th Cir. 2007); *Webb v. Allstate Life Ins. Co.*, 536 F.2d 336, 339 (10th Cir. 1976) (cited in *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 829-30 (10th Cir. 2008)). Ambiguous terms, or terms that are susceptible to more than one meaning, are construed strictly

against the insurer, due to the unequal bargaining positions of the parties to an insurance contract.  *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan*, 605 F.3d 789, 804-05 (10th Cir. 2010).

In the instant case, the Plan's operative phrase is "loss caused or contributed to by."  The Tenth Circuit has previously construed this phrase, in connection with a similar policy, to mean, "only where the illness causes the hospitalization and death . . . and not where the illness causes an accident that causes the death[.]"  *Kellogg*, 549 at 831.  In other words, the operative phrase would preclude coverage where the illness *directly* causes death, not where the illness *indirectly* causes death by triggering an accident that leads to death.  Where a chain of events leads to death, courts reviewing the denial of accidental death benefits seek to identify the proximate cause of the fatality, or the exact event that directly caused the death.  "[C]ourts have long rejected attempts to preclude recovery on the basis that the accident would not have happened but for the insured's illness."  *Id.*

For example, in *Kellogg*, the insured appeared to have a seizure while driving, which seizure caused him to lose control of the car and drive into a tree.  As a result, the insured suffered extensive brain hemorrhaging and a skull fracture, and the hemorrhaging led to his death.  *Id.* at 819-820.  A private pathologist concluded that the insured's "cause of death . . . is considered to be extensive subarachnoid hemorrhage of the brain secondary to traumatic transverse basilar skull fracture."  *Id.* at 820.  Additionally, a letter from the sheriff's department stated that the insured "died as a

result of traumatic injuries sustained in a solo motor vehicle accident." *Id.* at 822.

Despite the foregoing, the defendant insurance company denied accidental death

benefits on grounds that the insured's physical illness (*i.e.*, the seizure) caused the

car crash. *Id.* at 823.

Although the district court ruled in favor of the defendant insurer, the Tenth

Circuit reversed, based on its construction of the insurance plan's terms. The Tenth

Circuit construed the phrase "caused or contributed to by physical illness" to refer to

causes contributing to the <u>death</u>, not to the accident. *Id.* at 832 (citing *Orman v.*

*Prudential Ins. Co. of Am.*, 296 N.W.2d 380, 382 (Minn. 1980) (rejecting insurer's

argument that "caused or contributed to" language excludes physical infirmities

contributing to the accident); *Nat'l Life & Accident Ins. Co. v. Franklin*, 506 S.W.2d 765,

768 (Tex. App. 1974) (finding that the phrase "contributed to" does not allow a reviewing

court to "look back along the chain of causation to a remote cause or a cause of the

cause;" the phrase "does not avoid the proximate cause requirement.")). Accordingly,

the Tenth Circuit determined that the insured's death was caused by a skull fracture

resulting from the car accident, and, therefore, the cause of death was not excluded by

the accidental death benefits plan. *Id.* at 833.[11]

---

[11]   Defendant contends that Plaintiff's reliance on *Kellogg* is misplaced because the Tenth Circuit applied a *de novo* standard of review, whereas an abuse of discretion/arbitrary and capricious standard of review is appropriate in the instant matter. The purpose underlying this argument is unclear. If Defendant has raised this argument in an attempt to have the Court refrain from undertaking a construction of the Plan's terms, such argument lacks merit. *See Weber v. GE Group Life Assurance Co.*, 541 F.3d 1002, 1011 (10th Cir. 2008) (applying an abuse of discretion standard of review and strictly construing the insurance plan's terms against the defendant insurer). Under the abuse of discretion standard, a reviewing court determines

The aforementioned construction of the phrase "caused or contributed to by" was also previously applied in *Johnson v. Life Investors' Ins. Co. of Am.*, 98 Fed. Appx. 814, 818 (10th Cir. 2004) (unpublished), a case with a fact pattern analogous to the instant dispute. In *Johnson*, the insured, who suffered from a form of muscular dystrophy, suffered a cervical spine fracture in his neck after stumbling and falling backward down the stairs. *Id.* at 815. On the following day, the insured was admitted to the hospital where he subsequently developed pneumonia. *Id.* The insured died a few days after the accident, after his family decided to withdraw artificial life support. *Id.* The immediate cause of death was listed as pneumonia due to, or as a consequence of, a cervical spine fracture; myotonic dystrophy was listed as the underlying cause of death. *Id.*

In affirming the lower court's grant of summary judgment in the beneficiary's favor, the Tenth Circuit strictly construed the plan against the defendant insurer and determined that the policy denied coverage "only where the illness causes the hospitalization and death . . . and not where the illness causes an accident that causes the death[.]" *Id.* at 831.

Based on the aforementioned precedent, the Court finds that, in the instant case, coverage under the at-issue Plan is appropriate because Mr. Pavicich's hospitalization and death were directly caused by an accident – his fall – which caused a severe

---

whether the plan administrator's denial of benefits was arbitrary and capricious "based on the language of the plan." *Id.*

cervical spine injury.  Although the parties dispute whether Mr. Pavicich's fall was

caused by a seizure and/or any medication that he may have been taking, the Court

finds that such dispute is not material.  Seizure activity or the taking of the prescribed

medication were not but-for causes of Mr. Pavicich's hospitalization and subsequent

death; rather, his accidental fall was.  The record clearly indicates that Plaintiff's death

was caused by "complications of cervical spine injury following blunt force trauma [*i.e.*,

a fall]".  (*See* Arapahoe County's Coroner's External Examination Report, AR 00385-

00389; State of Colorado Certificate of Death, AR 00375).

Further, the Plan does not exclude coverage for deaths **resulting from**

**accidents** caused by "a bodily or mental infirmity" or "medical treatment," such as

medication.  Rather, the Plan excludes coverage for deaths **resulting from such**

**infirmities or medical treatment**.  Certainly, Defendant could have written the policy

in such a way to exclude **accidents** caused by bodily or mental infirmities or medical

treatments, but it did not.  In light of the foregoing, the Court finds that the Plan's plain

language provides coverage in this instance.  *See Kellogg v. Metro. Life Ins. Co.*, 549

F.3d 818, 832-833 (10th Cir. 2008); *Johnson v. Life Investors' Ins. Co. of Am.*, 98 Fed.

Appx. 814, 817-18 (10th Cir. 2004).  Therefore, the Court reverses Defendant's denial

of accidental death benefits, on grounds that such denial was arbitrary and capricious.[12]

_____

[12]   In further support of its denial of benefits, Defendant cites to several medical
malpractice or medical mishap cases, all of which are inapposite, as they concerned death that
directly followed from, or was proximately caused by, a particular course of medical treatment or
surgery.  (*See* Doc. # 22 at 19) (citing to, for example, *Thomas v. AIG Life Ins. Co.*, 244 F.3d
368, 369 (5th Cir. 2001) (disallowing accidental death benefits where death directly resulted

## V.  ATTORNEYS' FEES, COSTS, PRE-JUDGMENT INTEREST, AND EDUCATIONAL BENEFITS

## A.  ATTORNEYS' FEES AND COSTS

In addition to the benefits payable under the accidental death and personal loss coverage provisions of the Plan, Plaintiff seeks attorneys' fees, costs, pre-judgment interest, and payment of educational benefits for her and her children, pursuant to the Plan.

While Plaintiff has asserted her request for attorneys' fees in her Motion for Summary Judgment (Doc. #23 at 25-27), Defendant declined to respond to the request for attorneys' fees and pre-judgment interest, on grounds that the "issues are yet unripe for determination" and that "the parties should address these issues after this Court's decision."  (Doc. # 26 at 28 n.13.)  As a result, Defendant waived its opportunity to substantively oppose Plaintiff's request for attorneys' fees and pre-judgment interest, despite having a full and fair opportunity to do so.

---

from the rupture of the insured's sutures, following stomach stapling); *Senkier v. Hartford Life & Accident Ins. Co.*, 948 F.2d 1050, 1053 (7th Cir. 1991) (disallowing benefits where death directly resulted from a catheter that had punctured her heart); *Pickard v. Transamerica Occidental Life Ins. Co.*, 663 F. Supp. 126 (E. D. Mich. 1987) (disallowing benefits where patient died after being given one liter of potassium chloride 20% solution to drink, instead of another intended solution); *Reid v. Aetna Life Ins. Co.*, 440 F. Supp. 1182 (S.D. Ill. 1977) (disallowing benefits where death directly resulted from intravenous delivery of muscle relaxant instead of the intended saline solution)).

In the instant case, as noted above, Mr. Pavicich's death directly resulted from complications from his fall, namely "[c]omplications of cervical spine injury."  (*See* Arapahoe County Coroner's External Examination Report, AR 00385; State of Colorado Certificate of Death, AR 00375).  The death did not directly result from "a bodily or mental infirmity," "a disease, ptomaine, or bacterial infection," or "medical or surgical treatment."  Accordingly, the aforementioned cases do not apply.

Pursuant to 29 U.S.C. § 1132(g)(1), in an ERISA action, courts have the discretion to allow a reasonable attorneys' fee and costs of action to either party. Courts should not grant attorney's fees in ERISA cases as a matter of course. *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1209 (10th Cir. 1992). Rather, courts should consider the following nonexclusive list of factors:

(1)      the degree of the offending party's culpability or bad faith;

(2)      the degree of the ability of the offending party to satisfy an award of attorneys' fees;

(3)      whether or not an award of attorneys' fees against the offending party would deter other persons acting under similar circumstances;

(4)      the amount of benefit conferred on members of the plan as a whole; and

(5)      the relative merits of the parties' positions.

*Deboard v. Sunshine Mining and Refining Co.*, 208 F.3d 1228, 1244 (10th Cir. 2000). "[W]hile courts need not consider each factor, no single factor should be held dispositive." *McGee*, 953 F.2d at 1209 n.17.

In the instant case, with respect to the first factor, as noted above, the Court finds that Defendant's denial of accidental death benefits on grounds that Mr. Pavicich's death was caused by a seizure, bodily infirmity, and/or medication, was arbitrary and capricious; Mr. Pavicich's death was directly caused by his fall, a cause not excluded under the terms of the Plan.

With respect to the second factor, Defendant is a large insurance company and is therefore in a position to pay an attorneys' fee award.

As to the third factor, the Court finds that a fee award would have a deterrent effect on other plans and plan administrators who find themselves in similar situations. An award will encourage plan administrators and fiduciaries to reasonably interpret the plan's contractual terms rather than distort the plan's provisions to reach an outcome that is favorable for them but contrary to the plan's plain and ordinary meaning.

Finally, as to the fifth factor, the Court finds that a fee award is warranted in light of the arbitrary and capricious nature of the denial of benefits.

Accordingly, Plaintiff is directed to submit a brief accompanied by affidavits and exhibits in support of a motion for reasonable attorneys' fees. Such motion and brief shall comply with the requirements set forth in Fed. R. Civ. P. 54(d)(2) and D.C.COLO.LCivR 54.3.

With respect to Plaintiff's request for costs, pursuant to Fed. R. Civ. P. 54(d)(1), costs should be allowed to the prevailing party, unless a federal statute or a court order provides otherwise. Items that may be taxed as costs in an ERISA action are set forth in 28 U.S.C. § 1920. *See Allison v. Bank One-Denver*, 289 F.3d 1223, 1248-49 (10th Cir. 2002); *see also Kellogg v. Metro. Life Ins. Co.*, No. 2:06CV610, 2009 WL 3064748, at *3 (D. Utah Sept. 21, 2009) (unpublished). "[A]lthough a court in its discretion need not award section 1920 costs under Rule 54(d), it has no discretion to

award items as costs that are not set out in section 1920." *Sorbo v. United Parcel Service*, 432 F.3d 1169, 1179 (10th Cir. 2005).

In the instant case, the Court finds that an award of reasonable costs is warranted. Therefore, Plaintiff is permitted to submit a bill of reasonable costs, pursuant to § 1920.

## B. PREJUDGMENT INTEREST

Pursuant to 28 U.S.C. § 1961(a), "Interest shall be allowed on any money judgment in a civil case recovered in a district court."

"In ERISA cases, the court may award prejudgment interest to 'make persons whole for the loss suffered because they were denied use of money to which they were legally entitled.'" *Kellogg v. Metro. Life Ins. Co.*, No. 2:06CV610, 2009 WL 3064748, at *1 (D. Utah Sept. 21, 2009) (unpublished) (quoting *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1286 (10th Cir. 2002)); *see also LaAsmar*, 605 F.3d 789, 816 (10th Cir. 2010); *Allison v. BankOne-Denver*, 289 F.3d 1223, 1243-44 (10th Cir. 2002) ("The award of prejudgment interest is considered proper in ERISA cases.").

"A two-step analysis governs the determination of such an award. The district court must first determine whether the award of prejudgment interest will serve to compensate the injured party. Second, even if the award of prejudgment interest is compensatory in nature, the district court must still determine whether the equities would preclude the award of prejudgment interest." *Caldwell*, 287 F.3d at 1286 (internal citations and quotations omitted).

In the instant case, the Court finds that an award of prejudgment interest is warranted. Such an award would, without question, compensate Plaintiff for the time that she and her two minor children have been denied the accidental death benefits and, accordingly, the equities weigh in favor of such an award.

Further, pursuant to the Tenth Circuit in *Caldwell*, the calculation of prejudgment interest is within the court's discretion. *Id.* at 1287-88. Colorado law also provides for an award of prejudgment interest to the prevailing party. Where the action does not involve personal injury, the interest calculation is governed by COLO. REV. STAT. § 5-12-102(1)(b), pursuant to which the interest rate is set at eight percent per annum compounded annually "after [the moneys] are wrongfully withheld or after they become due to the date of payment or to the date judgment is entered, whichever first occurs."

In the insurance context, the breach occurs not when the insured demands payment under the policy, but rather when the insurer subsequently refuses to pay. *See James River Ins. Co. v. Rapid Funding, LLC*, No. 07-cv-01146, 2010 WL 965523, at * 6 (D. Colo. Mar. 16, 2010) (unpublished) (citing *Bowen v. Farmers Ins. Exch.*, 929 P.2d 14, 17 (Colo. App. 1996) (stating that, under section 5-12-102(1)(b), "the non-breaching party is entitled to recover prejudgment interest from the date of the breach."). "When an insurer improperly denies a claim, prejudgment interest is permitted on the amount of compensatory damages reflecting the benefit that the insured would have realized under the insurance contract, from the time of the wrongful withholding." *Herod v. Colo. Farm Bureau Mut. Ins. Co.*, 928 P.2d 834, 838 (Colo. Ct.

App. 1996). Accordingly, the Court will set a prejudgment interest rate of 8 percent per annum, compounded annually, to apply to the $300,000 in benefits that Plaintiff has been denied, since January 21, 2009, the date of Defendant's final decision.

## C.    EDUCATIONAL BENEFITS

In addition to the accidental death benefits, Plaintiff seeks educational benefits for her and her children, pursuant to the Plan's educational benefits provision. (Doc. # 24 at 28.) Pursuant to the Plan's terms, the provision of educational benefits is tied to the loss of life that is "solely and as a direct result of an accident." (AR 00659; *see also* 00661). Although the parties have directed the courts attention to documents in which Defendant denied accidental death benefits, none of these documents expressly discuss Plaintiff's application for Education Benefits or whether Plaintiff submitted such application. Therefore, the Court will remand this case to the Plan's administrator for further administrative review and issuance of a determination, consistent with this Order, concerning Plaintiff's alleged educational benefits claim.

## VI.  CONCLUSION

Accordingly, based on the foregoing, IT IS ORDERED THAT:

(1)    Plaintiff's Motion for Summary Judgment (Doc. #23) is GRANTED;

(2)    Defendant's Motion for Judgment Based Upon the Administrative Record (Doc. #22) is DENIED;

(3)    Defendant's denial of accidental death benefits is OVERRULED;

(4)     The Clerk of Court shall enter judgment in favor of Plaintiff and against

        Defendant in the amount of $300,000 (representing $75,000 in Basic and

        $225,000 in Supplemental Accidental Death benefits), plus interest

        accruing at a rate of 8 percent per annum, compounded annually, from

        January 21, 2009, the date of Defendant's final denial of Plaintiff's claim

        for accidental death benefits;

(5)     Plaintiff is directed to file a motion for attorneys' fees <u>by no later than</u>

        <u>October 12, 2010</u>.  Such motion shall comply with the requirements set

        forth in Fed. R. Civ. P. 54(d)(2) and D.C.COLO.LCivR 54.3.  Defendant

        shall file any response <u>by no later than October 26, 2010</u>, and Plaintiff

        shall file any reply <u>by no later than November 2, 2010</u>; and

(6)     This case is REMANDED to the plan administrator for further

        administrative review of Plaintiff's alleged educational benefits claim.

DATED:  September <u>  27  </u>, 2010

                                                BY THE COURT:

                                                _____
                                                CHRISTINE M. ARGUELLO
                                                United States District Judge

29